## Case No. 8,919.

### MACOMBER et al. v. THOMPSON.

[1 Summ. 384.] [2]

Circuit Court, D. Massachusetts. May Term, 1833.

MARITIME LIENS—SHARE OF WHALING VOYAGE—OFFSET—MISCONDUCT—DAMAGES—DIRECT AND IMMEDIATE.

1. In a suit for wages, or for a share in a whaling voyage, if the defence sets up misconduct, there must be a special allegation of the facts, with due certainty of time, place, and other circumstances; otherwise the court will reject it. Loose allegations of general misconduct are insufficient.

[Cited in The Cornelia Amsden, Case No. 3,234; Holmes v. Oregon & C. Ry. Co., 5 Fed. 76.]

[See The Almatia, Case No. 254.]

2. Damages can be recovered for the misconduct of a seaman, only when they are the direct

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Charles Sumner, Esq.]

and immediate result of his acts or omissions, not when they are remote and contingent; Causa proxima non remota spectatur.

3. Under the circumstances, one hundred dollars deducted from the share of the libellant in a whaling voyage, for gross misconduct.

[4. Cited in The Crusader, Case No. 3,456, Joy v. Allen, Id. 7,552, Duryee v. Elkins, Id. 4,-197, and Kellum v. Emerson, Id. 7,669, to the point that suits may be maintained either at law or in admiralty for shares or proportions of earnings in fishing voyages, such shares being the measure of the amount of wages.]

[5. Cited in Gurney v. Crockett, Case No. 5,-874, to the point that the admiralty will entertain suits for the compensation of maritime services not necessarily performed by mariners.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel [by John M. Thompson against Ichabod Macomber and others] for the share of the libellant, as cooper on a whaling voyage to the Pacific Ocean and back to the United States. The answer admitted the service and share of the party; but asserted gross misbehavior, as incurring a forfeiture. The decree of the district court was in favor of the libellant, from which an appeal was taken.

E. & F. Bassett, for libellant.
Simmons & Fletcher, for respondents.

STORY, Circuit Justice. This is a libel for the share of the libellant, as cooper of the ship Maine, of the proceeds of a whaling voyage to the Pacific Ocean and back to the United States, brought against the respondents, as owners of the ship. There is no controversy, that the service has been duly performed by the libellant for the voyage, and that he is entitled to the proceeds of his share of the earnings of the voyage, unless the matters of defence, set up in the answer, constitute a legal bar to the claim. The answer, in the first place, asserts, that the libellant "did not, and would not, though often thereto requested and ordered by the master and other lawful officers of the ship, obey the said master and officers having command and charge of the ship, but wholly neglected and refused so to do; and disobeyed their lawful commands, and violated his contract and agreement, and became mutinous, and attempted to excite a mutiny on board said ship, while at sea at divers times." Whatever may be the sufficiency of such an allegation in a declaration at common law, founded on the shipping articles, as it has no specification of time, place, occasion, or other circumstances, it is far too loose and general in its texture to found any defensive allegation in proceedings in the admiralty. Every charge of such a nature is there expected to be propounded, or, as it is technically phrased, articulated, in distinct articles in the answer, with due certainty of time, place, and other circumstances, so that the court may distinctly see, to what charges in particular the evidence applies. If, therefore, a preliminary

exception had been taken to the admission of the charge, thus generally and loosely framed, I should not have doubted, that the charge ought to have been expunged from the answer. As it is, I am clearly of opinion, that it is wholly insufficient in point of law to be acted upon by this court; and therefore, I should, if I did not deem it unsupported by the evidence, (as I certainly do,) deliver myself from all consideration of it. Where a charge of general and habitual misconduct is to be made out, it should be propounded in exact terms for the purpose; where specific acts of misconduct are to be relied on, they should be specifically put in issue, with due certainty and exactness of statement.

But the more important matter of defence, asserted by the answer, is, that on the return voyage, to wit, on the 10th of February, 1832, while the ship lay at Stonington in Connecticut, where she had been waiting for the opportunity of favorable winds and weather to return to her proper home port of destination, (Fairhaven, in Massachusetts,) and when orders were given to prepare for going to sea, the libellant used abusive language to the second mate of the ship, and refused obedience to orders; and clenched and assaulted the second mate; and told the chief mate he ought to be murdered; and assaulted and abused the chief mate; and conducted himself in so insolent and mutinous a manner, as to excite a mutinous spirit in many of the crew; so that the pilot on board refused to proceed to sea with the libellant on board; and it was in fact unsafe so to do; and that when the libellant had been secured, and before the pilot could get the ship out to sea, the wind changed, and the ship got upon dangerous rocks, and was greatly damaged; all of which damage was sustained in consequence of the very gross and mutinous misconduct of the libellant, and his disobedience of the lawful commands of the master and officers. The answer farther asserts, that the libellant was logged for the said offence by an entry in the log-book; and that the master went on shore, and entered a protest against him; and was obliged to confine, and did confine him, and keep him confined until the ship was moored in Fairhaven, where he was committed to prison in due form for trial for his mutinous conduct; and he did not return to the ship again. And it proceeds to allege, that the premises constitute a legal cause of forfeiture of the libellant's share of the proceeds; and that the damage sustained exceeds the value of that share.

The charge thus set up in its actual presentation is certainly of a very high and aggravated nature. If it were completely borne out in its full extent by the evidence, it would call for the severe animadversion of the court. Some parts of the charge are, however, wholly unsupported, not only in form, but in substance. Thus, the answer

would lead us to suppose, that the ship's going on shore, and receiving an injury was the direct and immediate effect of the misconduct of the libellant. Now, the fact is, that the misconduct of the libellant, whatever it was, took place early in the morning of the 10th of February, 1832. The master went on shore and made a protest, and after several hours' absence returned on board again; and the wind having then shifted, it became improper to put to sea; and the ship during the succeeding night, by the violence of a storm, drifted her anchors and went ashore. So that the injury in no sense, legal or moral, resulted from the misconduct of the libellant, but was a mere maritime casualty. The damage, then, was not attributable at all to the libellant. It was not a consequence of his misconduct, but remote and contingent. And he is not in any measure responsible for it; for the rule of law, as well as of common sense, is, "Causa proxima, non remota, spectatur."

As little foundation is there, in my judgment, for the charge, that there was real danger to the ship in putting to sea with the libellant on board, from any mutiny of the crew. No such spirit was exhibited on their part, and no disobedience of orders ensued; although, if some parts of the testimony are to be believed, the libellant endeavoured to provoke them to it. And if the libellant's being on board was dangerous to the safety of the ship, it was clearly the duty of the master to put him on shore, and not to hazard the voyage by retaining him, as he did, on board in irons. This act cannot, as I think, be fairly under the circumstances attributed to a mere desire to provide for the safety of the ship; for that might have been accomplished by the more summary process of dismissal; but to a desire to punish the libellant for his misconduct. That all the rest of the crew duly performed their duty at Stonington, and until the termination of the voyage, without any insubordination, is manifested by the whole tenor of the evidence.

The case, then, stands singly upon the asserted misconduct of the libellant in disobedience of orders, in using insulting language, and in assaulting and striking the chief and the second mate at the time stated in the answer. And my opinion is, upon a review of the whole evidence, that the charge is distinctly in substance made out. It is sufficiently apparent, that the libellant and the second mate entertained no very good will towards each other; and that the libellant was not slow to use his opportunities to exhibit it. His conduct on the preceding evening was very gross and insulting, and utterly without excuse; though it did not amount to any thing more than contumacy and abusive language. And, as far as the conduct of the second mate has appeared in evidence, it was certainly that of a civil and humane officer. The truth seems to be, that the libellant is a man of quick passions and resentments,

and could ill brook the commands and authority of the second mate, who was a foreigner by birth, (a Portuguese,) and towards whom he indulged a good deal of that contempt and pique, which is certainly an infirmity, if not a disease, in the American nautical character. That, in the affray on the morning of the 10th of February, the libellant was greatly to blame, if not wholly without excuse, is in my judgment clearly established by a decided preponderance of the evidence. I am also satisfied, that he struck both the first and second mate without any suitable justification. He was in a furious passion, and gave way the more readily to it, thinking that in the American waters he could more freely exercise his rights, according to his own boastful language, than he dared to do under the guns of a Portuguese fort. It is high time he should learn, that the American laws protect no man in insolence, disobedience of orders, mutinous conduct, or personal attacks; and least of all, protect the crew of a ship in such conduct towards their superior officers. The master was, therefore, fully justified in putting him in irons on this occasion by way of punishment, as well as of security. And I cannot but think, that the subsequent conduct of the libellant during the passage to Fairhaven was such as aggravated the original offence. It was not wholly without contrition, but in a spirit of cool and determined bravado. If a different course of conduct had been pursued, there might have been much to mitigate the offence; for repentance and an offer to return to duty are of high value and import in the maritime law. As the case stands, I should ill administer the true principles of that law, if I did not say, that the case called upon the court for an exemplary admonition. I do not think, that under all the circumstances I should be justified, for a single offence of this nature, in declaring a total forfeiture of the libellant's share of the proceeds. But I shall direct a deduction to be made of one hundred dollars from the amount remaining due; and each party must bear his own costs in this court. In other respects the decree of the district court is to be affirmed.

It is proper to add, that the main evidence, by which my judgment has been influenced in this decision, was never brought before the district court; so that there is no reason to consider, that there would have been the slightest difference of opinion upon this case between my learned brother and myself, if we had been called to decide it upon a similar posture of the evidence. Decree accordingly.

---

MACON (GARNETT v.). See Case No. 5,245.
MACON (SHORTRIDGE v.). See Case No. 12,812.
MACON (WHITE v.). See Case No. 17,553.
MACON COUNTY (JUDSON v.). See Case No. 7,568.